# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| KELLY K., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 17 C 4703 |
| | ) | |
| BEVERLY ("BJ") WALKER, Acting Director, | ) | |
| Illinois Department of Children and Family | ) | |
| Services ("DCFS"), in her official capacity; | ) | |
| MARILYN HAMILTON, a DCFS investigator, | ) | |
| in her individual capacity; MAURICE | ) | |
| JOHNSON, a DCFS supervisor in his individual | ) | |
| capacity; THAYER JOHNSON, a DCFS | ) | |
| supervisor, in his individual capacity; | ) | |
| ALEXANDRA BUNKER, a DCFS Area | ) | |
| Administrator, in her individual capacity; | ) | |
| AUNT MARTHA'S HEALTH AND | ) | |
| WELLNESS, INC., aka AUNT MARTHA'S | ) | |
| YOUTH SERVICE CENTER, INC. ("AUNT | ) | |
| MARTHA'S"); KIM DANIELS, and Aunt | ) | |
| Martha's case manager; KRISTEN GEORGE, | ) | |
| an Aunt Martha's intact family services | ) | |
| supervisor; MIA COLLINS, an Aunt Martha's | ) | |
| Administrator; MARC D. SMITH, Aunt | ) | |
| Martha's Vice President and Foster Care and | ) | |
| Intact Family Services Director, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court are three motions to dismiss portions of Plaintiff Kelly K.'s

("Kelly") Second Amended Complaint ("Complaint"), brought by (1) Defendant Aunt

Martha's Health and Wellness, Inc. ("Aunt Martha's"); (2) Defendant Beverly Walker ("Walker"); and (3) Defendants Kristen George ("George"), Mia Collins ("Collins") and Marc D. Smith ("Smith") (collectively, the "Aunt Martha's Defendants"), pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court grants all three motions.

## FACTUAL BACKGROUND

The Court accepts as true the following facts from Kelly's Complaint. All reasonable inferences are drawn in Kelly's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

Kelly is the mother of two teenage daughters. In 2006, Kelly secured a court order granting her primary custody of the children except on alternating weekends. On the morning of May 1, 2017, William P. ("Bill"), the children's father, threatened Kelly with a gun and physically assaulted her. Kelly claims that Bill threw her against a wall and "caused her to briefly see stars." After the altercation, Bill took their younger daughter and left. Kelly then called 911 to report the incident.

Responding to her call, Will County police officers arrested both Kelly and Bill. Kelly asserts in her Complaint that she was the "sole person" who was physically harmed on the morning of May 1, 2017. She alleges that Bill lied to the police and falsely claimed that Kelly pushed him, which led to her arrest. The following day, Kelly was released without charges, while Bill was charged with aggravated battery and domestic violence.

## I.  DCFS Investigation

On May 1, 2017, as a result of Bill's assault and arrest, the Illinois Department of Children and Family Services ("DCFS") received a Hotline call regarding the safety of Kelly's children.  The next day, Defendant Hamilton, a DCFS investigator, visited Kelly and informed her that her children were "under a safety plan with their grandparents."  Kelly asserts that Hamilton did not request Kelly's consent for the placement, nor did she provide Kelly with any documentation or other information regarding the safety plan on May 2.  Hamilton did not inform Kelly of any allegations against her or a pending DCFS investigation.  Kelly was not told that she was the target of an investigation.  Hamilton allegedly told Kelly that she had to come to the DCFS office to sign a "safety plan form" and would not have any contact with her children unless she "did what she was told."

On May 3, 2017, Kelly visited the DCFS office and signed a pre-prepared safety plan.  The plan required that the children stay with Bill's parents and have only limited, supervised contact with Kelly.  Kelly believed that signing the form was the only way she could see her children.  After Kelly and Hamilton signed the safety plan, Defendant Maurice Johnson ("M. Johnson"), Hamilton's supervisor, approved it.  Hamilton then provided Kelly with a copy of the safety plan and an already-completed CANTS 8[1]

---

[1] CANTS stands for "Child Abuse and Neglect Tracking System."  A CANTS 8 notice is a written notice regarding a DCFS investigation, titled "Notification of a Report of Suspected Child Abuse and/or Neglect."  It states the specific allegation the DCFS is investigating, explains the investigative process, and informs the receiver of his or her rights.

notice informing Kelly that DCFS was conducting an investigation as of May 1. Kelly was not provided a Safety Plan Rights and Responsibilities notification, which she claims DCFS is required to provide. Kelly alleges that the safety plan included terms inconsistent with the court order she had secured in 2006 giving her primary custody of her children.

## II.  *A.B.* Settlement Agreement

Kelly alleges that the aforementioned actions taken by DCFS and its agents violated the terms of a prior settlement in another lawsuit that "was intended to benefit persons subjected to safety plans and domestic violence victims who were the subject of DCFS investigations." DCFS entered into a settlement agreement to resolve a similar case, *A.B. et al. v. Holliman et al.*, No. 14-cv-7897 (N.D. Ill., Feinerman, J.), ECF No. 89 (hereinafter "*A.B.* settlement"), under which it agreed to amend various policies and procedures. Kelly alleges the following breaches of the *A.B.* settlement:

a. DCFS has not amended Procedures 300 Appendix G "to clarify that generalized 'risk' alone, without specific information/evidence of a risk of immediate moderate to severe harm to a child, does not support an 'Unsafe' determination." *A.B.* settlement at ¶ 3.a.

b. DCFS has not amended Appendix G to "further clarify that safety plans should not be developed unless and until a child protection investigator has determined, based on all reasonably available information/evidence, that DCFS possesses information/evidence of an immediate, unmitigated safety threat to a child that would cause moderate to severe harm to a child unless protective custody is taken." *A.B.* settlement at ¶ 3.b.

c. DCFS has not amended Appendix G "to further clarify that the above determination [described in b., directly above] is necessary for a child

protection investigator to develop[] a safety plan with the child's parent(s) or guardian(s)." *A.B.* settlement at ¶ 3.b.

d. DCFS has not clarified "its policies and procedures to provide [that] parent(s) and/or guardian(s) shall be given notice of the basis for taking protective custody of their child or children and that such notice shall be provided to the parent(s) or guardian(s) by the child protection investigator when developing a safety plan." *A.B.* settlement at ¶3.c.

e. While DCFS has reviewed its safety plan forms currently in use to ensure consistency with the *A.B.* agreement and to determine whether that written notice can be incorporated as part of the forms DCFS investigators already use, DCFS has failed to actually clarify the corresponding policies and procedures or actually issue the revised forms pursuant to the review it conducted (and to which the plaintiffs in *A.B.* agreed). *A.B.* settlement at ¶ 3.c.

f. DCFS has not clarified "its policies and procedures to require that Child Protection Supervisors shall review every five days each case in which there is an out of home safety plan to determine whether there remains an immediate, unmitigated safety threat to a child such that DCFS possess[es] a basis to take protective custody." *A.B.* settlement at ¶ 3.d.

g. DCFS has not directed, as the settlement provides, that "[i]f the Child Protection Supervisor's review determines that there is no longer an immediate, unmitigated safety threat to a child, the Child Protection Investigator should terminate the out of home safety plan." *A.B.* settlement at ¶ 3.d.

h. DCFS has not clarified "its policies and procedures to reinforce that in investigations where an individual (who is a parent or guardian) has left a home due to domestic violence and moved to a new home environment, the child protection investigator will consider and make a reasonable effort to assist the individual to access the possible options of domestic violence shelter services or the use of Norman funds prior to the consideration of a safety plan that would separate the parent from his or her child or children, if there are any safety concerns regarding the individual's current living situation for the individual and his or her children." *A.B.* settlement at ¶ 3.f.

i. DCFS has revised and published its Safety Plan Rights and Responsibilities forms in accordance with agreements reached in the *A.B.* settlement, but it has not incorporated the revisions into Procedures 300 Appendix G or other applicable policies and procedures. *A.B.* settlement at ¶ 3.h. Nor, as is clear from the facts of this case, has DCFS insured that parents who are subject to safety plans receive this Rights and Responsibilities information.

Kelly alleges that the breaches of this settlement agreement caused a deprivation of her constitutional rights to due process and merit an order compelling Defendant Walker, Acting Director of DCFS, in her official capacity, to comply with the *A.B.* settlement.

## III.  Aunt Martha's

### A. Family Services and Alleged Violations

Aunt Martha's is a non-profit corporation that provides child welfare and foster care services under a contract with DCFS.  Sometime between May 3 and May 18, 2017, DCFS referred Kelly and her family to Aunt Martha's to provide intact family services under an "out of home" safety plan.  Kelly alleges that Aunt Martha's, through its employees, "improperly coerced [her] to sign an amended safety plan continuing the removal of her children from her under color of state law."  She further asserts that Aunt Martha's "statements and omissions of required information about her rights intentionally, knowingly, and recklessly misled" her to believe that she was required to sign the plan in order for her daughters to be returned.

Kelly alleges that Aunt Martha's failed to give her a copy of the revised DCFS "Safety Plan Rights and Responsibilities for Parents & Guardians" document that

DCFS and private agencies under contract with DCFS are obligated to provide under the *A.B.* settlement.

On May 18, 2017, Defendant Kim Daniels ("Daniels"), an Aunt Martha's case manager, and Defendant Thayer Johnson ("Johnson"), a DCFS supervisor, met with Kelly at her home and prepared an amended safety plan. Kelly alleges that Johnson reiterated that she must sign the safety plan for her daughters to return home and for her to see them. She states that neither Daniels nor Johnson explained the legal or factual basis for her daughters being required to live under an "out of home" safety plan. They also failed to provide Kelly with her Safety Plan Rights and Responsibilities notification and did not allow her to choose any other caregiver for her daughters besides Bill's parents.

The amended safety plan required Kelly to participate in a mental health assessment and to take anger management classes. It also required her to follow all recommendations from both programs as a condition to end the safety plan. Kelly alleges that neither Daniels nor Johnson ever explained her right to "secure a neutral due process review before an impartial magistrate," never arranged for such a process, and never conducted an investigative interview of Kelly as a "suspected abuse or neglect perpetrator."

On May 25, 2017, Daniels met with Kelly, alone, to monitor her compliance with the amended safety plan. Daniels still did not provide Kelly with a copy of the plan or the Safety Plan Rights and Responsibilities notification. On June 1, 2017, Daniels

visited Kelly's home and provided her with the amended safety plan, which Kelly signed "understanding it was required to secure the return of her children." Kelly alleges that after signing, Daniels gave her an unsigned copy of the plan and never gave her a fully executed version.

On or about June 30, 2017, Kelly was informed that any allegations against her were "unfounded by DCFS." She asserts that, despite this notification, neither DCFS, the individual DCFS defendants, Aunt Martha's, nor the individual Aunt Martha's defendants returned the children to her. Instead, Kelly claims that Aunt Martha's kept Kelly's daughters from her and improperly colluded with Bill, despite knowing that Kelly never voluntarily agreed to any safety plan and filed this lawsuit. After Kelly requested the immediate return of her daughters, Kelly alleges that Aunt Martha's attempted to "sabotage" her efforts and sought, though unsuccessfully, a court order seeking to continue the separation.

Kelly alleges that Defendants George, Collins, and Smith (collectively, the "Aunt Martha's Defendants") had the authority to control and therefore prevent that improper conduct of Daniels and other Aunt Martha's employees. George, a family services supervisor, was responsible for overseeing Daniels' management of Kelly's case. Collins, an administrator, was responsible for overseeing Daniels' and George's case management. Lastly, Smith, Vice President of Aunt Martha's and Director of Foster Care and Intact Services, had supervisory responsibility for Daniels, George, and

Collins. Kelly claims that the Aunt Martha's Defendants, acting as supervisors, failed to prevent the misconduct.

Kelly alleges that, even after the court declined to grant the separation order, the Aunt Martha's Defendants "willfully, intentionally, deliberately and recklessly" retained Kelly's daughters from her while she and her counsel demanded their return. Kelly asserts that the Aunt Martha's Defendants knew or should have known that they were illegally withholding her daughters from her. As a result of their conduct, Kelly claims to have suffered a severe and irreparable rupture of her familial bonds with her daughters.

### B. Policies and Practices

Kelly first notes that Aunt Martha's has previously been sued for improper practices and violations of parental rights. Aunt Martha's employees were dismissed from the lawsuit via settlement. *Baltimore v. Illinois Department of Children and Family Services*, No. 10-cv-1031 (N.D. Ill. Andersen, J.). Kelly alleges that Aunt Martha's' conduct is a result of a widespread practice or pattern of unconstitutional behavior. She claims that DCFS "turned a blind eye" toward such improper practices, which led to a violation of her constitutional rights. Kelly states that Aunt Martha's acted as an "agent and designee of DCFS," adopting the "unconstitutional" policies, actions, and practices of DCFS as its own.

This pattern of behavior, Kelly asserts, is a result of Aunt Martha's failure to train its agents and employees from engaging in unconstitutional behavior in its

provision of services for DCFS. According to Kelly, such failure amounts to a deliberate indifference to the rights of people with whom Aunt Martha's comes into contact.

At all relevant times, Defendants Daniels, George, Collins, and Smith were employees or agents and under Aunt Martha's' control. Kelly claims that the alleged unconstitutional conduct or acts committed by these defendants occurred within the scope of their employment or agency relationship to Aunt Martha's and therefore Aunt Martha's is responsible for the injuries caused therefrom.[2]

## PROCEDURAL BACKGROUND

On June 22, 2017, Kelly filed a four-count Complaint against DCFS Defendants Lise Spacapan, in her official capacity as Acting Director of DCFS, Hamilton, M. Johnson, Johnson, and Bunker; Aunt Martha's; and Aunt Martha's Defendants Daniels, George, Collins, and Smith. On October 16, 2017, Kelly filed an amended complaint, naming Walker as a defendant in her official capacity as Acting Director of DCFS. On October 27, 2017, Kelly filed the subject of this opinion, her four-count Second Amended Complaint, which states the following causes of action: Count I, Compensatory and Punitive Damages for Violation of Plaintiff's Rights to Substantive Due Process under 42 U.S.C. §1983 (against DCFS Defendants Hamilton, M. Johnson, Johnson, and Bunker; Aunt Martha's; and Aunt Martha's Defendants Daniels, George,

---

[2] As discussed in more detail below, Kelly includes these allegations in an effort to preserve the *respondeat superior* liability issue for appeal.

Collins, and Smith); Count II, Compensatory and Punitive Damages for Violation of Plaintiff's Rights to Procedural Due Process under 42 U.S.C. §1983 (against DCFS Defendants Hamilton, M. Johnson, Johnson, and Bunker; Aunt Martha's; and Aunt Martha's Defendants Daniels, George, Collins, and Smith); Count III, Specific Performance Enforcement of the *A.B.* settlement (against Defendant Walker, sued in her official capacity); and Count IV, Negligence (against Aunt Martha's and Aunt Martha's Defendants Daniels, George, Collins, and Smith).

Aunt Martha's seeks to dismiss Counts I and II of Kelly's Second Amended Complaint. Aunt Martha's Defendants George, Collins, and Smith seek to dismiss all Counts pled against them, Counts I, II, and IV. Walker seeks to dismiss the only count pled against her, Count III.

## LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) "tests the sufficiency of the complaint, not the merits of the case." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 878 (7th Cir. 2012). The allegations in the Complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Kelly need not provide detailed factual allegations, but she must provide enough factual support to raise her right to relief above a speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "In conducting our review, we must consider not only the complaint itself, but also…documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial

notice." *Phillips v. Prudential Ins. Co. of America*, 714 F.3d 1017, 1019—20 (7th Cir. 2013).

A claim must be facially plausible, meaning that the pleadings must "allow…the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The claim must be described "in sufficient detail to give the defendant 'fair notice of what the…claim is and the grounds upon which it rests.'" *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 678.

## DISCUSSION

### I. Aunt Martha's: Counts I & II, Violation of Substantive and Procedural Due Process Rights under 42 U.S.C. § 1983

Aunt Martha's moves to dismiss Counts I and II of Kelly's Complaint, claiming that Kelly failed to plead an official policy, custom, or practice that allegedly caused her constitutional injury. It further argues that it cannot be liable under the theory of *respondeat superior*.[3]

---

[3] In her Complaint, Kelly includes allegations against Aunt Martha's under a *respondeat superior* theory of liability despite acknowledging that the Seventh Circuit rejected such claims against a private corporation in *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982). Because the Seventh Circuit recently hinted at overruling *Iskander* in *Shields v. Illinois Department of Corrections*, 746 F.3d 782 (7th Cir. 2014), however, Kelly asserts that the issue is ripe for reconsideration and wishes to preserve the issue for appeal. We therefore decline to consider Kelly's *respondeat superior* claims.

Seventh Circuit precedent precludes *respondeat superior* liability against private corporations under § 1983. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 792–95 (7th Cir. 2014). Instead, § 1983 claims against private corporations are analyzed under the standard applied to municipalities and government entities in *Monell v. Department of Social Services,* 436 U.S. 658 (1978). Therefore, to state a § 1983 claim against Aunt Martha's, Kelly must allege that her injury was "caused by an [Aunt Martha's] policy, custom, or practice, or a series of bad acts that together raise the inference of such a policy." *Shields*, 746 F.3d at 796.

### A. Policy, Custom, or Policy-Maker

The Seventh Circuit promulgated a three-part test under which a private corporation may be found liable under § 1983. Aunt Martha's may be liable if the alleged unconstitutional act is caused by:

> (1) an official policy adopted and promulgated by its [employees]; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority.

*Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010).

Kelly contends that Aunt Martha's violated her substantive and due process rights by keeping her children from her without a legal basis and failing to inform her of her rights during the process. Her factual assertions, as disheartening as they may be, are improperly alleged against Aunt Martha's. Kelly fails to connect the alleged unconstitutional behavior with any Aunt Martha's policy, custom, or practice.

Kelly does not identify an express Aunt Martha's policy, nor does she argue that an Aunt Martha's employee with final policy-making authority violated her constitutional rights. The remaining avenue for Kelly's claim against Aunt Martha's, then, is claiming a widespread practice of unconstitutional conduct.

There is no bright-line rule defining a "widespread practice" in the Seventh Circuit. "[T]here is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, 'except that it must be more than one instance,' or even three." *Thomas*, 604 F.3d at 303 (quoting *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988)).

Kelly maintains that her Complaint is "replete with specific instances of unconstitutional misconduct across tiers of decision-making authority at Aunt Martha's as to plead such a widespread practice to the entity." She points to several allegations in her Complaint, including that (1) Defendant Daniels "continued the unconstitutional practice adopted from DCFS of coercing [Kelly] to sign yet another safety plan;" (2) Kelly was not given the chance to defend herself in an investigative interview; (3) Aunt Martha's colluded with Bill and sought a court order seeking to continue the separation; and (4) Aunt Martha's continued the separation despite being denied that court order and the DCFS finding that the allegations against Kelly were unfounded.

As for the first allegation, Kelly slyly reframes it in her Response brief to include the element of Aunt Martha's adopting DCFS' allegedly unconstitutional policies. The allegation in her Complaint, however, relates only to Defendants Daniels and Johnson,

and makes no mention of DCFS policies or Aunt Martha's as an entity. The Court is bound to the facts alleged in the Complaint; therefore, we cannot consider Kelly's new assertion that any alleged coercion occurred as a result of DCFS or Aunt Martha's policies. *See Alcorn v. City of Chi.*, 2018 WL 3614010, at *16 (N.D. Ill. 2018) (citing *Gold v. Wolpert*, 1987 WL 10585, at *6 (N.D. Ill. 1987) ("[F]actual allegations contained in the briefs which are not alleged in the body of the complaint are not properly before the court on a motion to dismiss.")).

Kelly's remaining allegations fall short of claiming a widespread practice of unconstitutional conduct at Aunt Martha's. In addition to those listed above, Kelly spews a heap of allegations that Aunt Martha's violated her substantive and procedural due process rights, including that Aunt Martha's: (1) "knew Kelly did not voluntarily agree to the safety plan;" (2) knew that it did not have a legal basis to withhold the children; (3) "falsely indicated that signing the safety plan was the only way that Kelly would be able to see her children;" and (4) failed to inform Kelly of her procedural due process rights. Once again, Kelly amplifies the allegations in her Complaint, sometimes combining two very separate allegations to argue that she sufficiently pled a claim against Aunt Martha's. Even more, Kelly's conclusory allegations are not backed by any factual support.

More importantly, none of these allegations amount to a "widespread practice" of unconstitutional conduct. While there is no threshold number of instances Kelly must allege to sufficiently state a widespread practice claim, "isolated acts of

misconduct will not suffice." *Palmer v. Marion Cty.*, 327 F.3d 588, 596 (7th Cir. 2003).

Kelly's allegations are limited to Aunt Martha's employees' misconduct in managing her specific case. Her Complaint does not tie any of the wrongdoings to a practice that is "so permanent and well settled as to constitute custom." *Alcorn*, 2018 WL 3614010, at *17. There is no doubt that Kelly sufficiently alleges misconduct against some of Aunt Martha's employees[4], but merely pointing to multiple instances of misconduct by the same few individuals working on her case does not sufficiently state a widespread practice claim. *Compare Watson v. Vill. of Glenview*, 2000 WL 283977, at *3 (N.D. Ill 2000) (finding plaintiff's claims insufficient because he "provide[d] nothing other than his own isolated experiences, upon which he would have the Court conjure up some established or longstanding and widespread practice of harassment and retaliation") *with Caines v. Vill. of Forest Park*, 2003 WL 21518558, at *5 (N.D. Ill 2003) (finding plaintiffs' claims sufficient because they alleged "multiple acts of sexually harassing conduct occurring over an extended period of time" and "that others suffered similar harassment").

Kelly also alleges that Aunt Martha's "adopted and incorporated as its own unconstitutional practices, the policies, actions, and practices of DCFS." She argues:

> DCFS initiated the coercion that unlawfully caused [her] to separate from her children, but Aunt Martha's, in adopting DCFS' unconstitutional practices, policies and procedures of unlawfully applying coercion to obtain [Kelly's] agreement to a safety plan, itself applied coercion to obtain [Kelly's] consent to an amended safety plan.

---

[4] This is evidenced by the fact that many defendants, including Daniels, who bears the brunt of Kelly's allegations, filed Answers to Kelly's Complaint.

She adds that the seizure and removal of her children without probable cause, allegedly committed by both DCFS and Aunt Martha's, is unconstitutional. Kelly fails, however, to identify or even describe the "unconstitutional policies, practices, and procedures" of DCFS that she claims Aunt Martha's adopted. Kelly invites the Court to infer that, because she was allegedly coerced by DCFS and Daniels to sign the safety plans, this was caused by an unconstitutional policy, practice, or procedure. There are no facts to support such an inference. Kelly failed to allege that Aunt Martha's adopted an unconstitutional DCFS policy that caused her injury.

## B. Indirect Liability

Liability under § 1983 may also be "demonstrated indirectly 'by showing a series of bad acts and inviting the [C]ourt to infer from them that the policy-making level of [Aunt Martha's] was *bound to have noticed* what was going on and by failing to do anything must have encouraged or at least condoned…the misconduct." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 822 (7th Cir. 2009) (quoting *Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 927 (7th Cir. 2004)) (emphasis added). Kelly argues that she sufficiently alleged such a claim. For support, she largely refers to the same allegations already discussed above. Again, these allegations fail to raise an inference that Aunt Martha's encouraged or condoned unconstitutional conduct as a matter of pattern or practice. *See Jones v. Feinerman*, 2011 WL 4501405, at *6 (N.D. Ill. 2011) (holding that the plaintiff's alleged series of bad acts were insufficient because they

were "limited only to him" and did not represent a "pattern" of misconduct); *Young v. Obaisi*, 2015 WL 8013437, at *3 (N.D. Ill. 2015) (rejecting a "speculative" claim that Wexford employees' alleged mishandling of the plaintiff's injury "rais[es] a question of a policy or custom of deliberate disregard for medical care"). Like the plaintiff in *Young v. Obaisi*, Kelly's allegations read much like speculation that, because certain Aunt Martha's employees mishandled Kelly's case, there must have been a pattern of such behavior at Aunt Martha's.

Kelly also claims that Aunt Martha's failed to follow known DCFS guidelines and, through its employees, "repeatedly failed" to provide Kelly with the Safety Plan Rights and Responsibilities document as required under its contract. She adds that Defendant Daniels "never gave [Kelly] a fully executed copy" of the safety plan. The Court cannot draw an inference, based on these allegations, that Aunt Martha's itself, as opposed to the individual defendants, is liable for their misconduct. Again, isolated incidents of misconduct during the management of Kelly's case are insufficient to place Aunt Martha's on the hook.

Lastly, Kelly alleges that Aunt Martha's failed to train its employees to refrain from engaging in unconstitutional conduct. Her Complaint lacks factual support for her boilerplate assertion. Kelly points to a previous lawsuit, *Baltimore v. Illinois Department of Children and Family Services*, No. 10-cv-1031 (N.D Ill. Andersen, J), in which the plaintiff accused Aunt Martha's of violating his parental rights. She alleges

that Aunt Martha's "did not properly train its agents and employees to refrain from repeating similar conduct" after the lawsuit, which was resolved by settlement.

This allegation is insufficient for many reasons. First, although both lawsuits involve alleged violations of parental rights, the fact patterns are different. There was no allegation in *Baltimore* that Aunt Martha's coerced the plaintiff into signing a safety plan or failed to inform him of his rights, both key issues in Kelly's Complaint. Second, because Aunt Martha's was dismissed via settlement, there has been no finding as to whether it previously engaged in improper misconduct. Third, this allegation alone does not "raise a reasonable expectation that discovery will reveal evidence" that Aunt Martha's failure to train resulting in a pattern of misconduct that ultimately injured Kelly. *Cf. Horton v. City of Chi.*, 2014 WL 5473576 (N.D. Ill. 2014) (finding allegations that defendant "failed to adequately train and supervise" their security guards, resulting in "numerous instances of civil rights of civil rights violations by other security guards" to be "sufficient—albeit barely"). At most, it speculates that, because Aunt Martha's was sued for constitutional violations now and eight years ago, it must have failed to train its employees. Such a logical leap is implausible. Kelly has not sufficiently alleged her failure to train claim.

*       *       *

For the reasons stated above, the Court finds that Kelly failed to sufficiently allege her § 1983 claims against Aunt Martha's. We accordingly grant Aunt Martha's motion as to Counts I and II.

**II. Defendants George, Collins, and Smith: Counts I & II, Violation of Substantive and Procedural Due Process Rights under 42 U.S.C. § 1983; and Count IV, Negligence**

Defendants George, Collins, and Smith (hereinafter, the "Aunt Martha's Defendants") move to dismiss Counts I, II, and IV against them. They argue that Kelly failed to plead her § 1983 claim against them because she did not allege their personal involvement in the unconstitutional conduct. They also contend that Kelly's negligence claim fails because she did not plead that they owed her a duty or that they breached any duty to her.

**A. Counts I & II, Violation of Substantive and Procedural Due Process Rights**

An individual defendant cannot be held liable under § 1983 unless he or she "caused or participated in the alleged constitutional deprivation." *Rascon v. Hardiman*, 803 F.2d 269, 273 (7th Cir. 1986). Although there is no *respondeat superior* liability under § 1983, supervisors may be held liable where they are "personally involved in [the] conduct." *Jones v. City of Chi.*, 856 F.2d 985, 992 (7th Cir. 1988). To be personally involved, "[t]he supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." *Id.* at 992–93.

It is clear from Kelly's allegations that the Aunt Martha's Defendants did not personally interact with Kelly at any time. Instead, Kelly argues that they *knew* about

the unconstitutional conduct and did not use their authority to prevent it from continuing. The Aunt Martha's Defendants contend that Kelly did not sufficiently allege that they had knowledge of the unconstitutional conduct.

Kelly's allegations against the Aunt Martha's Defendants rely on their supervisory positions. She alleges that Defendant George was "an intact family supervisor" responsible for "overseeing [] Daniels' case management regarding [Kelly] and her children." Defendant Collins was George's supervisor, and in that role oversaw both Daniels and George's case management. Lastly, Defendant Smith, Vice President of Aunt Martha's and Director of Foster Care and Intact Services, had supervisory responsibility over Collins, George, and Daniels. Kelly alleges that, based on their supervisory roles, the Aunt Martha's Defendants were "responsible for continuing the unlawful separation of [Kelly] from her children and for enforcing the illegal restrictions on contact between [Kelly] and her children."

Kelly first argues that George, as Daniels' direct supervisor, may be found liable. She relies on *DeLaFont v. Beckelman*, which held a supervisor liable where she had an "independent responsibility to review [a subordinate's] findings and make determinations." 264 F. Supp. 2d 650, 657 (N.D. Ill. 2003). The court in *DeLaFont* noted that the DCFS supervisor reviewed her subordinates' findings and acted as a "screen" against erroneous determinations. *Id.* Kelly contends that her allegations of George's supervisory responsibilities "establish that [George] similarly acted as a screen." We disagree. Kelly merely points to the fact that George "oversees" Daniels'

case management. That, alone, does not give rise to the inference that George acted as a screen for Daniels' determinations, knew of Kelly's case, or that she should have known the details of her case.

In fact, George's role in Kelly's case is similar to two defendants in *DeLaFont* who were dismissed. The court noted that there were no allegations that those two defendants "independently evaluated evidence against [the plaintiff] or made any discretionary decisions as to leaving the directives in place." *Id*. It concluded that "reasonable officials in their positions could rely on the findings made by other DCFS officers." *Id*. Kelly similarly failed to make any allegations that George was personally involved in or had knowledge of Kelly's case, other than the fact that George was Daniels' supervisor and oversaw her case management.

Kelly also asserts that Defendants Collins and Smith "knew they were administering a system that caused [her] rights to be violated." She cites to *Klein v. DuPage County*, which held that a jail superintendent can be personally liable under § 1983 "as a policymaker if he knowingly, willfully or recklessly, through his actions or failure to act, set up a system in which…injuries would be expected to occur." 1986 WL 13537, at *6 (N.D. Ill. 1986). The plaintiffs in *Klein*, however, alleged more facts that would lead to such an inference. They alleged that the jail superintendent "ordered, authorized, permitted, ratified, was deliberately indifferent to or deliberately ignored" improper strip searches. *Id*.

Kelly attempts to analogize her allegations with those in *Klein*. She reiterates her allegations that Collins and Smith had supervisory responsibility over Daniels and George and therefore had "ultimate responsibility for their continuing the unlawful separation of [Kelly] from her children and for enforcing the illegal restrictions on contact between [Kelly] and her children." She claims that these allegations are "sufficient to show that Defendants Collins and Smith were not distant supervisors, but rather persons 'directly involved in administering a system which cause the plaintiffs' injuries.'" *See id.* at *6. We disagree. Kelly's allegations are nothing more than conclusory statements that attempt to impute both knowledge and responsibility for the misconduct solely on the basis of Collins and Smith's supervisory roles. The Court cannot draw an inference, based on these allegations, that the Defendants were directly involved in administering any system that led to Kelly's alleged injury.

The next set of allegations against Aunt Martha's Defendants are as follows:

> Even after knowing that there was no court order and that none would issue, Aunt Martha's Defendants George, Collins, Smith, Daniels, and Defendant Aunt Martha's willfully, intentionally, deliberately and recklessly retained the children away from [Kelly's] custody while she and her counsel demanded their return to her care. For the entire period after the filing of this suit until July 7, these Defendants knew or should have known that they were illegally withholding [Kelly's] children from her.

Kelly contends that she sufficiently alleges that the Aunt Martha's Defendants had knowledge of the fact that Aunt Martha's separated her children without a legal basis to do so. She states that the Complaint establishes that they "had actual knowledge that

Aunt Martha's sought a court order" and that it was denied, which she argues is sufficient to establish personal involvement. Simply stating that the Aunt Martha's Defendants had knowledge of the court order, however, is inadequate.[5] It is unclear whether each of the defendants would have known about the anticipated court order, especially when Kelly fails to provide any information on it except its alleged existence. Nor do her vague assertions that the Aunt Martha's Defendants knew about the lawsuit or that her counsel demanded her children sufficiently allege each individual defendant's knowledge. In fact, Kelly's Complaint itself shows that Kelly is uncertain whether the Aunt Martha's Defendants had actual knowledge; she alleges that they "knew or *should have known* that they were illegally withholding" Kelly's children. Personal involvement requires "knowledge and consent." *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982). Kelly's conclusory statement that the Aunt Martha's Defendants knew about the court order, her counsel's demand, or this lawsuit is insufficient to allege the their personal involvement. *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

Kelly pleads nothing more than legal conclusions that the Aunt Martha's Defendants, in their supervisory roles, must have known about the underlying

---

[5] While Kelly correctly asserts that she "need not allege factual allegations of how Defendants had knowledge of the constitutional violation," she must still plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Williams v. Macklin*, 2008 WL 4696136, at *1 (N.D. Ill. 2008).

misconduct occurring on her case. Her Complaint does not include specific allegations, like the case law she cites, showing that the Aunt Martha's Defendants had actual knowledge and were personally involved in the unconstitutional conduct. For these reasons, Defendants George, Collins, and Smith are dismissed from Counts I and II of Kelly's Complaint.[6]

## B. Count IV, Negligence

Having dismissed all federal claims against Defendants George, Collins, and Smith, all that remains against them is Kelly's state law negligence claim. Because some of Kelly's federal claims remain against other defendants, the Court would have to exercise pendent party jurisdiction over the negligence claim against the three defendants. The Court has discretion to refuse to exercise pendent jurisdiction, however, and accordingly declines to exercise that power. *Huffman v. Hains*, 865 F.2d 920, 923 (7th Cir. 1989) ("[E]ven where the power exists to hear a pendent state-law claim, the decision whether to exercise that power rests in the district court's discretion."). We dismiss Kelly's negligence claim against Defendants George, Collins, and Smith.

\*     \*     \*

---

[6] Both sides also discussed whether DCFS had published a revised Safety Plan Rights and Responsibilities form and whether Aunt Martha's was obligated to provide this form to Kelly and other parents. Though this discussion arose partly from confusion, the Court finds it tangential to the actual issue on the motion to dismiss, *i.e.*, whether the Aunt Martha's Defendants were personally involved in the misconduct. Having disposed of Kelly's § 1983 claims against the Aunt Martha's Defendants on that issue, the Court disregards this discussion.

For the aforementioned reasons, all claims against Defendants George, Collins, and Smith are dismissed.

### III.  Walker: Count III, Specific Performance Enforcement of the *A.B.* settlement

Count III alleges that Kelly is an intended beneficiary under the *A.B.* settlement and seeks specific performance of the settlement agreement.  Kelly claims that DCFS has not complied with the *A.B.* settlement by failing to amend its policies and procedures.  Walker is sued in her official capacity as Acting Director of DCFS.  Walker moves to dismiss Count III, with prejudice, on grounds that sovereign immunity bars the enforcement of the *A.B.* settlement in federal court, the Illinois Court of Claims has exclusive jurisdiction over enforcement of the *A.B.* settlement, and Kelly lacks standing as a third-party beneficiary to enforce the *A.B.* settlement.

### A. Sovereign Immunity Under the Eleventh Amendment

The Eleventh Amendment "bars an action in federal court against a state, its agencies, or its officials in their official capacity" without the state's consent. *Gossmeyer v. McDonald*, 128 F.3d 481, 487 (7th Cir. 1997) (citing *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100–102 (1984)).  There are, however, exceptions to the Eleventh Amendment bar on suits against the state or state officials. Among these are where the state official has engaged in unconstitutional conduct, *Pennhurst*, 465 U.S. at 104, and where the plaintiff seeks "prospective relief" to "enjoin

state officials to conform their future conduct to the requirements of federal law." *Quern v. Jordan*, 440 U.S. 332, 337 (1979).

Kelly raises both exceptions to sovereign immunity. She argues that the *Pennhurst* exception applies, given that her claim for specific performance is "inextricably intertwined" with her §1983 due process claim, which arises "as a result of the DCFS Defendants' failure to comply with the *A.B.* settlement." Walker disputes this characterization of Count III, arguing that Kelly brought her claim for specific performance pursuant to 28 U.S.C. §1367 (supplemental jurisdiction), and under no theory of constitutional violation. Walker contends that Kelly's allegation that she "suffered the deprivation of her fundamental rights" due to DCFS' alleged breach of contract does not convert Count III into a constitutional claim. We agree. The key allegation in Count III is not that Walker or DCFS violated a constitutional right, but rather that they have not complied with the *A.B.* settlement.

Kelly further argues that specific performance of the *A.B.* settlement falls under the *Quern* exception, since enforcement of the *A.B.* settlement would "merely require DCFS to clarify its policies and procedures to provide parents and guardians with notice of their rights during DCFS investigations," therefore simply requiring DCFS to conform its conduct to the requirements of federal law. Walker asserts that *state law* governs a suit to enforce settlement of a federal suit. *Lynch, Inc. v. SamataMason, Inc.*, 279 F.3d 487, 490 (7th Cir. 2002). She argues that non-compliance with the settlement agreement, governed by state law, cannot be judged in federal court because there is no

continuing violation of federal law, and specific performance would compel the state to act.

The Eleventh Amendment, however, does not bar this Court from enforcing a previous federal decree voluntarily entered by the state. Kelly cites *Komyatti v. Bayh*, in which a class of Indiana prisoners filed suit for enforcement of a settlement agreement entered to resolve a previous §1983 due process claim for poor prison conditions. 96 F.3d. 955 (7th Cir. 1996). The court in *Komyatti* held that the simple fact that a standard of state law was incorporated into a decree did not bar enforcement of the decree under the Eleventh Amendment. Because the decree "spring[s] from and serve[s] to resolve the underlying constitutional violation…a provision in a validly entered consent decree is an obligation on state officials to conform their conduct to federal law." *Komyatti*, 96 F.3d. at 960; *see also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 440 (2003) (upholding enforcement of a consent decree requiring Texas Medicaid providers to conform to federal requirements and opining that "federal courts are not reduced to approving consent decrees and hoping for compliance").

Like the agreement in *Komyatti*, the *A.B.* settlement was entered to resolve a §1983 constitutional claim between the plaintiffs in that case and DCFS officials. Walker is correct; enforcement of the agreement must be governed by state law. However, the simple fact that Illinois law must govern the settlement agreement cannot, in and of itself, void enforcement of a duly entered federal settlement. It defies logic to believe that the Eleventh Amendment would allow litigation and settlement of due

process claims, then render enforcement of judgments or settlements in those suits unenforceable. Therefore, consistent with *Komyatti* and *Frew*, the Eleventh Amendment does not bar Kelly's claim seeking specific performance of a federal settlement.

## B. Exclusive Jurisdiction in the Illinois Court of Claims

Walker also argues that the Illinois Court of Claims has exclusive jurisdiction over the enforcement of the settlement agreement, pursuant to the Court of Claims Act, 705 ILCS 505/8(b).[7] In support, Walker cites to *Aurora National Bank v. Simpson,* wherein the court held that the Court of Claims has exclusive jurisdiction over "all claims against the State founded upon State law, contract, and tort." 118 Ill. App. 3d. 392, 396 (2d Dist. 1983). Kelly counters with *Doe ex rel. G.S. v. Johnson*, wherein the court exercised supplemental jurisdiction over tort claims despite DCFS' argument that the Illinois Court of Claims had exclusive jurisdiction. 1993 WL 390357, at *5 n.3 (N.D. Ill. 1993).

Both parties erroneously cite the case law supposedly supporting their arguments on this ground. The court in *Doe* originally decided to exercise supplemental jurisdiction over the state tort claims, but later overturned its decision to retain the claims on a motion to reconsider. *See Doe ex rel. G.S. v. Johnson*, 1993 WL 427735 (N.D. Ill. 2003). The court found that it was improper to exercise supplemental

---

[7] "The court shall have exclusive jurisdiction to hear and determine the following matters: (b) All claims against the State founded upon any contract entered into with the State of Illinois."

jurisdiction over the state claims when the federal claims in the case had all been fully adjudicated. *Id.*, at *2. *Doe* does not lend weight to a discussion that this Court should disregard duly enacted Illinois law, which, in our opinion, does not give federal courts the choice to exercise supplemental jurisdiction without a thorough analysis as to whether the Court of Claims has *exclusive* jurisdiction.

Walker cites to language in *Aurora* that broadly states that the Court of Claims has exclusive jurisdiction over "all claims against the State found upon State law, contract, and tort." 118 Ill. App. 3d at 396. Based on this one sentence alone, Walker unequivocally states that the Court of Claims has exclusive jurisdiction over Count III as it is a contract claim against the state. Such a blind argument ignores the possibility of exceptions, which do exist, to the broad rule. In fact, the court in *Aurora* hints at one exception and hedges its language accordingly: "Where a party seeks *monetary* judgment against an agency payable out of state funds, the proper forum is not the circuit court, but rather the [C]ourt of [C]laims." *Aurora*, 118 Ill. App. 3d at 397 (emphasis added). The *Aurora* court distinguished between such cases and those in which a court is merely enforcing a duty imposed by statutory law, for example. *See id.* (discussing the holding in *First Finance Co. v. Pellum*, 62 Ill. 2d. 86 (1975), which stated that a circuit court had jurisdiction over the enforcement of a duty created by a statutory proceeding).

Without a clear answer from the parties' briefs and corresponding case law, the Court turns to *Salaita v. Kennedy*, which is more analogous to the case at bar. 118 F.

Supp. 3d 1068 (N.D. Ill. 2015).  In *Salaita*, a professor sued the University of Illinois, stating that the University breached their employment contract by failing to appoint him as a faculty member.  The University's decision came after Salaita took to his Twitter to post a series of "harsh" remarks criticizing Israel in its conflict with Palestine.  *Id*. at 1075.  Salaita alleged that the University violated his First Amendment rights by voting against his appointment.  *Id*. at 1091.

The court in *Salaita* debated whether the Court of Claims had exclusive jurisdiction over the contract claim against the state university.  It noted that "[w]hether an action is in fact one against the State and hence one that must be brought in the Court of Claims depends on the issues involved and the relief sought."  *Id*. (citing *Leetaru v. Bd. of Trs. of Univ. of Ill.*, 332 N.E.3d 583, 595 (Ill. 2015)).  For example, the Court of Claims Act "affords no protection…when it is alleged that the State's agent acted in violation of statutory or constitutional law or in excess of his authority."  *Id*.  The court determined that Salaita could pursue injunctive relief in federal court because he claimed that the University violated the First Amendment in breaching the employment contract.  *Id.* ("If the plaintiff in *Leetaru* could seek injunctive relief outside the [Court of Claims] based on the University's allegedly unconstitutional conduct in investigating

academic dishonesty, Dr. Salaita can pursue similar injunctive relief here based on the Board's alleged violation of the First Amendment in voting against his appointment.").[8]

Count III of Kelly's Complaint, however, only claims that "DCFS, by and through [Walker], has breached its agreement in *A.B.*" A "simple breach of contract and nothing more" does not trigger the exception to sovereign immunity. *Leetaru*, 32 N.E.3d at 596. Although Kelly argues, outside of Count III, that the alleged breach caused her constitutional harm, the breach itself is not unconstitutional. In contrast, Salaita alleged that the University violated his First Amendment rights, and that violation caused the breach of contract. Where Kelly alleges a breach that may cause constitutional harm, Salaita alleged a constitutional violation that led to a breach of contract. Because Kelly does not allege any unconstitutional conduct in her specific performance claim, the Court of Claims has exclusive jurisdiction over enforcement of the *A.B.* settlement.[9] Count III is dismissed with prejudice.

---

[8] To be clear, the court also noted the distinction between injunctive relief and monetary relief: "Thus, at least as to his claims for injunctive relief, Dr. Salaita can proceed in federal court." *Salaita*, 118 F. Supp. 3d at 1091. The court then considered Salaita's state law claims for damages, which it described as the "thorniest issue." *Id.*

[9] The Court notes that Kelly nonetheless lacks standing, under Illinois law, to enforce the *A.B.* settlement. She is not an intended third-party beneficiary of the *A.B.* settlement, which is an agreement solely between the plaintiffs in that case and DCFS and does not expressly intend to benefit all "parents or guardians" as a class. *See 155 Harbor Drive Condo. Ass'n v. Harbor Point, Inc.*, 568 N.E.2d 365, (Ill. App. Ct. 1991) (holding that the plaintiff was not a third-party beneficiary of a contract because it "failed to identify any language in the subcontract which constitutes a virtual express declaration to overcome the presumption that the parties contracted only for themselves").

**CONCLUSION**

For the reasons stated above, the Court grants Aunt Martha's motion as to Counts I and II, without prejudice. The Court also grants Defendants George, Collins, and Smith's motion to dismiss Counts I, II, and IV against them, without prejudice, and they are dismissed from the case entirely. Lastly, Count III is dismissed with prejudice and Defendant Walker is dismissed from the case. It is so ordered.

Dated: 9/27/2018

Charles P. Kocoras
United States District Judge